**DEPARTMENT OF WATER & POWER OF CITY OF LOS ANGELES, v. UNITED STATES.**

No. 48593.

United States Court of Claims.

July 10, 1950.

Northcutt Ely, Washington, D. C., Robert L. McCarty, Washington, D. C., on the brief, for plaintiff.

Gaines V. Palmes, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and WHITAKER, HOWELL, MADDEN, and LITTLETON, Judges.

WHITAKER, Judge.

The Department of Water and Power of the City of Los Angeles operates a system of electric works owned by the city for the generation of electrical energy and its distribution to users both within and without the city.

Under the charter to the city of Los Angeles the Department of Water and Power of the City of Los Angeles is given the power to sue and be sued. It is the plaintiff herein.

In March 1942 the War Department began the construction of a Japanese relocation center in Inyo County, California. This camp is known in the record as Camp Manzanar. Plaintiff furnished the camp with electricity for lighting purposes, and it also furnished it electricity for power purposes. It sues for the difference between what it says it is entitled to therefor and what the Government has paid it. The Government has paid it $126,900.26, but plaintiff claims that it is entitled to $180,820.62, and it sues for the difference of $53,920.36. Except for a minor amount, the difference claimed is for electrical energy furnished for lighting purposes.

On March 16, 1942, and on several subsequent dates, defendant, represented by its War Department, signed six applications for electrical energy for lighting and power purposes to be furnished it at Camp Manzanar. The power for lighting purposes was furnished under the application dated March 16, 1942, and known as "Main 4800V Service." The letters "L" and "G" on the application show that this energy was being supplied for lighting purposes to the Government. It was supplied to the Government at 4,800 volts. The Government, by the use of some 83 transformers, stepped this current down and distributed it to the various places where it was needed in the camp.

The application was on a standard form of the Department of Water and Power of the City of Los Angeles. With reference to rates it provided: "Such service shall be furnished at ordinance rates, and under the Department's current operating practice and its Rules and Regulations."

Ordinance No. 76,903 of the City of Los Angeles, to which the application referred, defines three lighting services, as follows: (a) Street Lighting Service, defined in section 2 of the ordinance; (b) Domestic Lighting and Appliance Service, defined in section 3; and (c) General Lighting Service, defined in section 4. The current furnished for street lighting is not in issue here. Only the two latter sections are pertinent.

Section 3 of the ordinance reads in part as follows:

*"Domestic Lighting and Appliance Service*

"That the rates to be charged and collected by the Department of Water and Power for furnishing and supplying electric energy, alternating current, single phase, for domestic and household purposes to the inhabitants of said Counties of Inyo and Mono, are hereby fixed as follows:

"For the first 35 kwhrs. consumed in any one month for family accommodations having five or less standard lighting circuits, and for 5 kwhrs. per lighting circuit for each circuit in excess of five, 6.0 cents per kwhr.

"For the next 65 kwhrs. consumed in any one month, 2.3 cents per kwhr.

"For the next 100 kwhrs. consumed in any one month, 1.5 cents per kwhr.

"For all in excess thereof, consumed in any one month, 1.25 cents per kwhr.

"Provided that,

\* \* \* \* \* \*

"(3) The above rate for domestic service is applicable only to private single residences or to any individual family accommodations, used primarily for domestic and household purposes, as distinguished from commercial, professional or industrial purposes, having installed lighting and/or lighting, cooking, heating, water

heating, or other power-consuming appliances, also single phase motors not in excess of three (3) horsepower each, all served through one meter."

Defendant says it is entitled to have the charges against it computed under this section. It has paid plaintiff in accordance with the rates therein prescribed. Plaintiff, however, says that it is entitled to be paid under section 4 of the ordinance. This section reads in pertinent part as follows:

### "General Lighting Service— Alternating Current

"That the rates to be charged and collected by the Department of Water and Power for furnishing and supplying the electric energy requirements, alternating current, for general lighting purposes with or without appliances or other power on the same metered service, to the inhabitants of said Counties of Inyo and Mono, are hereby fixed as follows:

"For the first 35 kwhrs. consumed in any one month, 6.0 cents per kwhr.

"For the next 365 kwhrs. consumed in any one month, 3.6 cents per kwhr.

"For the next 600 kwhrs. consumed in any one month, 3.0 cents per kwhr.

"For the next 1,000 kwhrs. consumed in any one month, 2.5 cents per kwhr.

"For all over 2,000 kwhrs. consumed in any one month, 1.8 cents per kwhr.

"Provided that,

"(1) Motors not in excess of three (3) horsepower each and/or X-ray apparatus not in excess of five (5) Kva. each may be served with lighting load under this schedule only when connected at 220 volts single phase (motors of one-fourth ($\frac{1}{4}$) horsepower or less and lamp socket devices may be served at 110 volts single phase.) [1]"

The issue in the case is over which one of the two sections of the ordinance is applicable for the service furnished defendant.

For the first two months, bills for the service furnished were presented to defendant computed under the "general lighting service" rates, and they were paid. However, on May 18, 1942, the operation of the camp was transferred from the War Department to the War Relocation Authority, and this agency refused to pay future bills computed under the "general lighting service" rate, on the ground that the Government was entitled to the "domestic lighting and appliance service" rate.

On October 5, 1942, the defendant wrote plaintiff stating that no contract had ever been entered into between plaintiff and defendant for the furnishing of electrical service at this camp and it, therefore, enclosed a standard form of contract, which plaintiff was requested to complete, sign, and return. Plaintiff at first replied that it did have a contract with the defendant, consisting of the applications signed prior to the furnishing of any service; however, a little over two weeks later the Board of Water and Power Commissioners authorized its "business agent" to execute the contract enclosed in the defendant's letter of October 5, 1942. On October 30, 1942, the contract was completed by plaintiff by filling in certain information in spaces left blank by defendant, and it was executed and forwarded to defendant. The portion inserted by plaintiff relative to rates reads as follows: "LA. City Ord. #76,903, Secs. 3 & 5, per copy of ordinance attached, and Ord. #87,028, to become effective 12/1/1942, likewise attached."

This contract governs the rights of the parties, since it was dated as of March 18, 1942, the date service began.

It is true that the evidence does not show when the contract was executed by defendant and no copy of it after execu-

1. On December 1, 1942, the above ordinance was superseded by Ordinance No. 80,728, and on January 1, 1945, the latter ordinance was superseded by Ordinance No. 88,806, but the provisions of all the ordinances relative to the rates for "domestic lighting and appliance service" and "general lighting service" were the same, although the section numbers in the several ordinances were different.

tion by defendant was forwarded to plaintiff, although defendant had said in its letter of October 5, 1942, that after it had been executed and returned by plaintiff, "one copy will then be executed by the Government and returned to you." However, on December 17, 1942, the manager of Camp Manzanar sent plaintiff a photostatic copy of the contract which had been executed by the defendant some time prior thereto.

■ Defendant's failure to transmit to plaintiff an executed copy of the contract may have prevented consummation of a written contract; but, since plaintiff executed the contract as requested by defendant, and furnished the service called for therein, and defendant accepted the service, presumably on the basis of the contract which it had requested plaintiff to execute, a contract will be implied according to the terms of the written contract forwarded to plaintiff by defendant and executed by plaintiff.

This contract called for the furnishing of electrical energy for lighting and for power according to the provisions of sections 3 and 5 of Los Angeles City Ordinance No. 76,903, a copy of which was attached to the contract. Ordinance No. 87,028 was also attached to the contract, but there was no reference made to its appropriate sections. The sections of the two ordinances relating to lighting and to power were the same, although they bore different section numbers. The rights of the parties are, therefore, to be governed by the provisions of section 3 and 5 of Ordinance No. 76,903, to which reference was made in the contract. Section 3 related to the furnishing of electrical energy for lighting, and section 5 related to the furnishing of electrical energy for power. The dispute relative to energy furnished for power is negligible.

So far as energy furnished for lighting is concerned, the plaintiff agreed in the contract to furnish electrical energy according to the rates set out in section 3 of the ordinance, which is the "domestic lighting and appliance service" rates. This is the basis upon which the defendant has computed the amount due plaintiff, which amount has been paid it.

■ We are of the opinion that plaintiff is entitled to recover on this basis, and none other, for energy furnished for lighting. Section 4 of the ordinance relating to "general lighting service" was not mentioned in the contract and, therefore, has no application. The only two sections referred to are sections 3 and 5. Section 3 relates to "domestic lighting and appliance service" and section 5 relates to electrical energy furnished for power purposes, both of which were furnished by plaintiff. It is the rates established by these two sections which govern the rights of the parties.

Plaintiff's claim is based upon rates set out in section 4 relating to "general lighting service," although these rates are not mentioned in the contract. It attempts to justify this on the ground that if it applied the rate set out in section 3 of the ordinance relating to "domestic lighting and appliance service," supplemented by the practice which it employed in computing bills for domestic lighting and appliance service where more than one family was serviced through one meter, its bill would greatly exceed the amount computed under section 4 relating to "general lighting service"; and it says that it is its practice to give a consumer the benefit of the lowest available rate.

As we have said above, the general lighting service rate has no application. If plaintiff is entitled to the benefit of the practice it employed in computing bills for "domestic lighting and appliance service," where more than one family was served through the same meter, it would be entitled to collect from the defendant $332,999.06, although it claims only $180,820.62, the amount computed under the "general lighting service" rate. The question then comes down to plaintiff's right to apply this practice to the computation of the amounts due it under its contract with defendant.

The findings show that it was the practice of the plaintiff, and of other utility companies on the Pacific Coast, in cases

where more than one family were served through a single meter, to multiply the several rate blocks, set out in section 3 of the ordinance, by the number of families being served through one meter, and to apportion the aggregate to the several families in accordance with the consumption of each family as ascertained by investigation and study. Thus, if 10 families were served on one meter, the first rate block of 6 cents per kilowatt-hour for the first 35 kilowatt-hours would be multiplied by 10, and the next rate block of 2.3 cents per kilowatt-hour for the next 65 kilowatt-hours would be multiplied by 10, and so on; and then the aggregate, divided by 10, would be the amount due by each family, adjusted in accordance with their estimated consumption.

This practice, however, was not followed where there were more than 15 or 20 consumers on the same meter. In Camp Manzanar there were 36 city blocks of barrack-type buildings. There were 14 buildings to the block. Each of these buildings contained four apartments. In addition, there were 18 similar buildings of four apartments each for the Government employees. There was a total of 2,116 separate family accommodations. Sixteen barracks buildings were devoted to school purposes, and 20 were devoted to a hospital area. In the camp there were also mess halls, bath houses, garages, service stations, power houses, chicken ranches, hog farms, and other facilities for general use.

If this practice were applied to the defendant, the amount due under the first rate block of 6 cents per kilowatt-hour for the first 35 kilowatt-hours would be multiplied by 2,116, for there were 2,116 separate family accommodations; and the amount due under the next rate block of 2.3 cents per kilowatt-hour for the next 65 kilowatt-hours would be multiplied by 2,116, and so on. The aggregate would be divided by 2,116, and this would be defendant's bill.

There is, however, no warrant in the contract between the parties, nor in any ordinance, nor in any rule or regulation of the Board of Water and Power Commissioners of the city of Los Angeles, to which the contract refers, or to which we have been referred, which justifies any such practice. Indeed, it was not applied, as we said, where there were more than 15 or 20 consumers on the same meter.

Certainly the contract between the parties makes no reference to any such practice. That contract provides for a rate for electrical energy for lighting purposes computed in accordance with section 3 of Ordinance No. 76,903. That ordinance provides for 6 cents per kilowatt-hour for the first 35 kilowatt-hours, 2.3 cents per kilowatt-hour for the next 65 kilowatt-hours, and so on; but it makes no reference whatsoever to plaintiff's practice of multiplying each block by the number of units being served on the same meter.

We cannot read this practice into the contract between the parties. It has no application to the situation met with in this case.

According to the contract, plaintiff is entitled only to 6 cents per kilowatt-hour for the first 35 kilowatt-hours furnished; 2.3 cents per kilowatt-hour for the next 65 kilowatt-hours; 1.5 cents per kilowatt-hour for the next 100 kilowatt-hours; and 1.25 cents per kilowatt-hour for all energy consumed in excess of 200 kilowatt-hours. This is the basis upon which defendant computed its liability.

Inasmuch as defendant consumed an average of about 250,000 kilowatt-hours per month, it is obvious that it would pay a rate of 1.25 cents per kilowatt-hour for practically all of the energy consumed by it for lighting purposes. This is a fair rate considering the amount of current consumed by it. The Hotel Biltmore in Los Angeles consumed approximately the same amount of current used by defendant at Camp Manzanar, and the rate charged the Hotel Biltmore was less than one cent per kilowatt-hour. The rate charged by the Southern California Electric Company, and the Pacific Gas and Electric Company, and by the California Electric Power Company to small communities, for resale by them to the residents thereof, was something less than one cent per kilowatt-hour.

It would thus appear that a rate of 1.25 cents per kilowatt-hour would approximate a fair rate for defendant to pay for the energy furnished it. But whether reasonable or not, this is the rate provided for in the contract between the parties, and, of course, this contract governs. We refer to rates charged .other consumers only for the purpose of showing that the amount agreed upon by the parties is one that is fair both to the plaintiff and to the defendant, and to show that the application of plaintiff's practice of multiplying the several rate blocks by the number of consumers on one meter is improper in this case.

The testimony relative to the charges paid by the Biltmore Hotel and the charges of other utility companies to consumers similar to the defendant was excluded by the commissioner of this court on the ground that contract rates between the parties in this case governed, irrespective of rates charged by plaintiff and other utility companies to other consumers. The commissioner was correct in saying that the contract rates govern, but we think the testimony might have been received as evidence of the intention of the parties to contract for the rates set out in section 3 of Ordinance No. 76903, without any implied intention that there should be applied thereto plaintiff's practice of multiplying the various blocks set out in that rate by the number of units served through one meter. It should have been received to show that the custom or usage of the trade is not to be read into this particular contract.

The evidence will now be received; the substance of it has been incorporated in our finding 19.

We are of the opinion that plaintiff is only entitled to the rates set out in section 3 of the ordinance. This amount has been paid it. It is not clear from the evidence what dispute, if any, there is between the parties as to the energy furnished for power; hence, judgment will be reserved until the filing of a stipulation by the parties showing the correct amount due plaintiff, if any, computed in accordance with the findings and this opinion, or, in the absence of such a stipulation, until the incoming of a report by a commissioner showing the correct amount. It is so ordered.